## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE        )

                            )

v.                         )        **ID No. 1703001172**

                            )        **Cr. A. Nos. IN17-03-0408, etc.**

**KASHIEM D. THOMAS,**     )

                Defendant. )

Submitted:  September 17, 2024
Decided:  December 16, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Defendant Kashiem D. Thomas's Motion for Postconviction Relief,*
**DENIED**.

*Upon Postconviction Counsels' Motion to Withdraw,*
**GRANTED**.

Carolyn S. Hake, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Patrick J. Collins, Esquire, and Kimberly A. Price, Esquire, COLLINS PRICE & WARNER, Wilmington, Delaware, for Mr. Thomas.

Kashiem D. Thomas, *pro se*.

**WALLACE, J.**

Kasheim Thomas filed an application seeking postconviction relief from his first-degree murder conviction. He asked for and was appointed postconviction counsel. Now—as Mr. Thomas has been with both his trial and appeals counsel—he is dissatisfied with their efforts. Indeed, in his view, all counsel that have ever represented him have engaged in such an intolerable degree of "misrepresentation and ineffective assistance" that "the only equitable remedy would be to dismiss the charges and grant [his] immediate release."[1]

The Court has closely examined Mr. Thomas's motion for postconviction relief,[2] his supplements to that motion,[3] his postconviction attorneys' motion to withdraw with its supplements,[4] the affidavits of Mr. Thomas's trial and appellate counsel,[5] and the State's responses to all of these filings.[6]

For the reasons below, Mr. Thomas's Motion for Postconviction Relief is **DENIED** and his counsels' Motion to Withdraw is **GRANTED**.

---

[1]  D.I. 163; D.I. 165.

[2]  D.I. 101 ("Def.'s Rule 61 Mot.").

[3]  D.I. 138 ("Def.'s Resp. to 61(e)(7) Mot."); D.I. 145 ("Def.'s Mem. on Am. Rule 61 Mot."); D.I. 146 ("Def.'s Am. Rule 61 Mot."); D.I. 155 ("Def.'s Supp. to Am. Rule 61 Mot."); D.I. 156 ("Def.'s Reply Br.").

[4]  D.I. 132 ("PCR Counsel's Mot. to Withdraw Br."); D.I. 133-35 ("PCR Counsel's App'x" [contents of those three comprehensive volumes will be cited hereinafter as "A-***"]; and D.I. 166-67 ("PCR Counsel's Supp. Resp.").

[5]  D.I. 139 ("App. Counsel's First Aff."); D.I. 143 ("Trial Counsel's First Aff."); D.I. 148-49 ("Trial Counsel's Supp. Aff."); D.I. 150 ("App. Counsel's Supp. Aff.").

[6]  D.I. 151 ("State's Resp."); D.I. 152 ("State's App'x" [contents of this appendix will be cited hereinafter as "B-***"]; D.I. 159 ("State's Supp. Resp."); D.I. 168.

## FACTUAL[7] AND PROCEDURAL BACKGROUND

On February 23, 2017, at approximately 8 p.m., gunfire erupted on the 600 block of East 23rd Street of Wilmington. When the dust settled, two men were down. Keevan Hale had been struck multiple times and collapsed inside his residence at 602 East 23rd Street.

Kashiem Thomas was felled on the front sidewalk just outside Mr. Hale's home. He had been struck in the right rear flank when Mr. Hale fired back at him. Mr. Thomas could not get to his feet, despite efforts to do so, and remained incapacitated on the sidewalk.

The testimonial and video evidence introduced at trial showed some of the actions of the two men just before the shooting started.

Mr. Hale had been drinking beer on his porch and talking with his neighbor, Hale Omar Baird. At that same time, video surveillance recorded Mr. Thomas purchasing a cigarette from a convenience store about a block away on the corner of 23rd and Pine Streets. That surveillance footage captured Mr. Thomas leaving the store wearing dark pants, a black North Face jacket, and a ski mask rolled up on his forehead. It also tracked him walking toward the direction of his home on the 300

---

[7] Unless otherwise noted, this factual recitation is derived from the prior written decisions issued in this case. *See State v. Thomas*, 2019 WL 669934, at *1 (Del. Super. Ct. Feb. 8, 2019) (denying motion for judgment of acquittal) ("*Thomas I*") (A-1133-1144); *Thomas v. State*, 2020 WL 1061692, at *1 (Del. Mar. 4, 2020) (affirmance on direct appeal) ("*Thomas II*") (A-1226-1228).

block of East 23rd Street.  On this trek, Mr. Thomas stopped briefly and interacted with those in a car that had pulled up to him.  He then continued to walk toward home.

A few minutes later, the same surveillance camera caught Mr. Thomas again—now with his ski mask rolled down over his face, his hood pulled up, and his right hand in his pocket—walking towards the 600 block of East 23rd Street as two cars passed by.  Forty-one seconds after leaving the surveillance camera's view, ShotSpotter[8] alerted to ten gunshots outside the Hale residence.

Just before the gunfire, Mr. Baird had left Mr. Hale to walk to the convenience store and purchase more beer.  On his walk, Mr. Baird saw a man wearing all black and a mask pass him.  Moments after passing him, Mr. Baird  heard gunshots.  Mr. Baird testified that the black-clad man was the only person he saw on that block of 23rd Street when Mr. Hale was shot.  And the sum of his trial testimony and pre-trial statements made it clear that Mr. Thomas—whom Mr. Baird had just passed on the street and whom he saw trying to get up from the sidewalk just after the exchange of gun fire—was the person who shot and killed Mr. Hale.

From inside her home, Mr. Hale's mother watched her son fall through their

---

[8]    "ShotSpotter Inc. is a company that partners with law enforcement agencies nationwide to implement its network of gunfire-detecting acoustic sensors to monitor and notify police of purported gunshots and enable faster responses." *ShotSpotter Inc. v. VICE Media, LLC*, 2022 WL 2373418, at *1 (Del. Super. Ct. June 30, 2022) (cleaned up).

front door bleeding. She called 911. While on that call, she located Mr. Hale's 40 caliber handgun on her front porch and passed it to her daughter who hid it in their couch before the police arrived.

Police arrived quickly to a bevy of onlookers, intermeddlers, and various members of both the Hale and Thomas families. The first responding officer was there within two minutes of the Spotshotter alert. He found Mr. Thomas injured on the sidewalk just outside the Hale house. The officer attempted to render medical aid, but Mr. Thomas resisted telling the officer, "Don't touch me, get off me." And a never-identified man wearing a yellow traffic vest who was present told Mr. Thomas, "Yo, don't answer his questions, don't tell the cops shit." The crowd that continued to form crouched around the officer and Mr. Thomas and hindered the officer's attempt to provide aid as they awaited paramedics. Medical and forensic evidence demonstrated the Mr. Thomas suffered a single gunshot wound to his lower back; he had been hit by a .40 caliber round.

Officers found Mr. Hale injured inside his home. He had sustained four to six gunshot wounds to his torso and upper extremities. Before being taken to the hospital, Mr. Hale responded affirmatively when officers asked: "The guy outside shot you, buddy?" But Mr. Hale was *in extremis* on his living room floor and was unable to answer any of the follow-up inquiry for a description or whether Mr. Hale knew his shooter. At the hospital, Mr. Hale died that evening from his multiple

injuries.  The weapon used to shoot and kill Mr. Hale fired .410 shot shells.

The police located Mr. Hale's Smith & Wesson Walther PPS .40 caliber handgun tucked under the arm of the couch in his living room.  Strewn on the grass in front of 602 East 23rd Street and near its front porch area, they found four Smith & Wesson .40 caliber spent cartridge casings, as well as three plastic shell casings and wadding from .410 shot shells.  And in the door of a car parked across the street from Mr. Hale's residence, they removed a discharged .40 caliber copper bullet jacket fragment.  Additionally, officers saw multiple projectile holes covering the door frame of a neighboring home and Mr. Hale's shattered glass home door.  The firearm that was used to kill Mr. Hale was never found.  And by the time police got to him, no firearm was on or around Mr. Thomas.

Forensic evidence showed gunshot residue on Mr. Thomas's hand.  Two ShotSpotter analyst reports were also introduced at trial.  In the first, the analyst concluded that the initial five shots of ten detected were fired from the street in front of the Hale residence.  The second analyst found: (a) that those first five shots were fired from the sidewalk directly in front of Mr. Hale's house; (b) three shots were then fired from the Hales' lawn; and (c) two more shots were fired from the lawn directly adjoining the Hales' home.

Mr. Thomas was arrested and charged with first-degree murder and related

weapons counts.[9] And following a six-day jury trial, Mr. Thomas was convicted of first-degree murder and possession of a firearm during the commission of a felony.[10]

Mr. Thomas moved both before the matter was submitted to the jury, and after, for a judgment of acquittal arguing the State had presented insufficient evidence.[11] Both motions were denied. [12]

Mr. Thomas was sentenced to life in prison plus fifteen years.[13]

He filed a direct appeal to the Delaware Supreme Court where, again, he argued that the State had presented insufficient evidence to convict him.[14] His convictions and sentence were affirmed. [15]

## MR. THOMAS'S MOTION
## FOR POSTCONVICTION RELIEF

Mr. Thomas filed his first timely postconviction motion *pro se* with an accompanying request for counsel.[16] The Court granted his motion for counsel and Patrick J. Collins, Esquire, and Kimberly A. Price, Esquire, (hereinafter

---

[9]  A-94-95 (Indictment).

[10]  A-1088-1089 (Verdict Form). The State entered a *nolle prosequi* as to a third indicted offense—possession of a firearm by a person prohibited (IN17-03-1728)—which had been severed by agreement for trial by the Court without a jury. *See* D.I. 53.

[11]  *See Thomas I*, 2019 WL 669934, at *1.

[12]  *Id.* at *1, *6.

[13]  A-1145-A-1149 (Modified Sentencing Order).

[14]  *See Thomas II*, 2020 WL 1061692, at *1-2.

[15]  *Id.* at *3.

[16]  Def.'s Rule 61 Mot.; D.I. 102 ("Mot. for Appointment of Postconviction Counsel).

"Postconviction Counsel" or "PCR Counsel") were appointed to represent Mr. Thomas in his postconviction proceedings.[17]

The Court provided Postconviction Counsel with the opportunity to review the complete record in this matter and file an amended motion if, in their professional judgment, amendment was appropriate.[18]

Postconviction Counsel has now filed a Motion to Withdraw as Counsel.[19] In their motion, Postconviction Counsel report that, after careful review of Mr. Thomas's case, Mr. Thomas's claims are so lacking in merit that they cannot ethically advocate for them; and further, that they are unaware of any other substantial grounds for relief.[20]

Under this Court's Criminal Rule 61(e)(7):

> If counsel considers the movant's claim to be so lacking in merit that counsel cannot ethically advocate it, and counsel is not aware of any other substantial ground for relief available to the movant, counsel may move to withdraw. The motion shall explain the factual and legal basis for counsel's opinion and shall give notice that the movant may file a response to the motion within 30 days

---

[17]  D.I. 108.

[18]  After Postconviction Counsel was appointed, Mr. Thomas moved *pro se* for a writ of habeas corpus.  D.I. 111.  The Court did not consider Mr. Thomas's writ because he was represented by counsel.  D.I. 114; Del. Super. Ct. Crim. R. 47.  Postconviction Counsel then filed their first motion to withdraw stating that Mr. Thomas no longer wanted to be represented by counsel during these proceedings. D.I. 116-17.  After Mr. Thomas changed his mind about proceeding on his own, that initial motion was deemed moot and Postconviction Counsel continued their representation. D.I. 123, 125, and 177.

[19]  *See generally* PCR Counsel's Mot. to Withdraw Br.

[20]  *Id.* at 25-36.

of service of the motion upon the movant.[21]

Postconviction Counsel provided Mr. Thomas with a copy of their withdrawal motion and advised Mr. Thomas of his ability under Rule 61(e)(7) to file a response thereto.[22] Mr. Thomas responded[23] to the motion to withdraw and filed a separate motion to stay all proceedings.[24]

Mr. Thomas's trial and appellate counsel have filed affidavits addressing Mr. Thomas's postconviction claims.[25]

In addition to his first *pro se* motion for postconviction relief,[26] Mr. Thomas filed what he entitled "amended postconviction relief motions" and other supplements—all after Postconviction Counsel's motion to withdraw.[27] Given the posture of the case when those latter filings were made and the fact that they were

---

[21] Super. Ct. Crim. R. 61(e)(7).

[22] *See* D.I. 131 and D.I. 137.

[23] Def.'s Resp. to 61(e)(7) Mot.

[24] D.I. 142 ("Def.'s Mot. to Stay").

[25] App. Counsel's First Aff.; Trial Counsel's First Aff.; Trial Counsel's Supp. Aff.; App. Counsel's Supp. Aff.

[26] D.I. 101.

[27] *See* Def.'s Mem. on Am. Rule 61 Mot. and Def.'s Am. Rule 61 Mot.; Def.'s Supp. to Am. Rule 61 Mot.; Def.'s Reply Br. Because some of the issues raised in Mr. Thomas's supplements were either new or significant revisions of his prior complaints, the Court instructed Postconviction Counsel to re-examine all of Mr. Thomas's claims to assure their withdraw was still warranted. D.I. 174. Counsel did so, and their position on their Rule 61(e)(7) motion was unchanged. PCR Counsel's Supp. Resp. So too, was the State's in response to Mr. Thomas's final tally of claims. D.I. 168.

permitted at Mr. Thomas's express request,[28] the Court deems them responses allowed by Rule 61(e)(7).

The State has responded to and opposes Mr. Thomas's varied prayers for postconviction relief.[29]

## RULE 61 PROCEDURAL REQUIREMENTS

To evaluate Mr. Thomas's postconviction claims and determine whether his counsels' motion to withdraw should be granted, the Court should be satisfied that Mr. Collins and Ms. Price conducted a truly conscientious examination of the record and the law for claims that could arguably support Mr. Thomas's Rule 61 motion. The Court should also conduct its own review of the record to determine whether Mr. Thomas's Rule 61 motion is devoid of any, at least, arguable postconviction claims.[30]

It's long been Delaware law that courts must consider Criminal Rule 61's procedural requirements before addressing any substantive issues.[31] The procedural bars in Rule 61 are timeliness, repetitiveness, procedural default, and former

---

[28] *See, e.g.*, Def.'s Supp. to Am. Rule 61 Mot. (discussing Mr. Thomas's assertion that he "should be granted leave to add these additional claims and/or points for consideration to assist with the ruling on the postconviction counsel's motion to withdraw" and "ask[s Court] to grant leave to add these additional claims").

[29] State's Resp.; State's Supp. Resp.

[30] *State v. Lindsey*, 2023 WL 2535895, at *5 (Del. Super. Ct. Mar. 16, 2023), *aff'd*, 2023 WL 8232287 (Del. Nov. 27, 2023).

[31] *Maxion v. State*, 686 A.2d 148, 150 (Del. 1996); *State v. Jones*, 2002 WL 31028584, at *2 (Del. Super. Ct. Sept. 10, 2002).

adjudication.[32]   Of these, just one is at play here.

Rule 61(i)(3) bars any particular claim that could have been but was not raised at trial or on direct appeal, unless the defendant can show cause for relief from the procedural default and prejudice.[33]  Generally, Rule 61(i)(3) is inapplicable to claims of ineffective assistance of counsel—which in the norm can't be raised against trial counsel on direct appeal[34] and as a practicality aren't yet ripe against appeals counsel until the resolution of direct appeal.  And so, the Court usually considers those claims on their merits during postconviction proceedings.[35]

But Mr. Thomas's attempt to raise freestanding claims of trial error are procedurally barred as such by Rule 61(i)(3) if  they were never raised at trial or on

---

[32]  *State v. Peters*, 283 A.3d 668, 680 (Del. Super. Ct. 2022), *aff'd*, 2023 WL 3880124 (Del. June 7, 2023); *State v. Madison*, 2022 WL 3011377, at *2 (Del. Super. Ct. July 29, 2022), *aff'd*, 2022 WL 17982946 (Del. Dec. 29, 2022).  These procedural requirements are considered on a claim-by-claim basis.  *State v. Reyes*, 155 A.3d 331, 342 n.15 (Del. 2017) (instructing that the "Rule 61 analysis should proceed claim-by-claim, as indicated by the language of the rule"); *Madison*, 2022 WL 3011377, at *2.  And, if any one of these bars applies to a specific claim, then the inmate must show entitlement to exception therefrom under Rule 61(i)(5).  *Id.*; Super. Ct. Crim. R. 61(i)(5) (providing that Rule 61's procedural bars found in (i)(1)-(4) do not apply to a claim: that the court lacked jurisdiction; that pleads with particularity new evidence of the defendant's actual innocence; or, that application of a new rule of constitutional law made retroactive on collateral review is required).

[33]  Super. Ct. Crim. R. 61(i)(3) ("Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows . . . [c]ause for relief from the procedural default and . . . [p]rejudice from violation of the movant's rights.").

[34]  *See State v. Smith*, 2017 WL 2930930, at *1 (Del. Super. Ct. July 7, 2017); *see also Guy v. State*, 82 A.3d 710, 715 (Del. 2013) (noting that in Delaware ineffective assistance of trial counsel may not be raised on direct appeal).

[35]  *State v. Martin*, 2024 WL 3273429, at *2 (Del. Super. Ct. July 1, 2024).

direct appeal. That said, most of those are slightly different takes on or subsumed within Mr. Thomas's collection of ineffective assistance of counsel (IAC) claims and all are, therefore, addressed and resolved below.

## MR. THOMAS'S POSTCONVICTION CLAIMS

Mr. Thomas's multiple filings contain myriad and oft-overlapping allegations, complaints, and issues that the Court has organized and addresses as:

### A. PCR Claim No. One – Admission of ShotSpotter Evidence

**1.** The Court improperly curtailed a *Daubert* challenge[36] of the proffered ShotSpotter evidence.[37]

**2.** Trial Counsel should have had ShotSpotter evidence excluded.[38]

**3.** The State allowed "perjured" testimony from its ShotSpotter expert.[39]

**4.** The Court improperly curtailed cross-examination of the State's Shotspotter expert.[40]

**5.** Appellate Counsel should have included and argued ShotSpotter evidence issues.[41]

---

[36] Such an application to exclude expert testimony invokes *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 794 (Del. 2006) (adopting the holding in *Daubert* to interpret Delaware's analog rules of evidence governing the admission of expert testimony).

[37] Def.'s Am. Rule 61 Mot. at 4; Def.'s Mem. on Am. Rule 61 Mot. at 63-69.

[38] Def.'s Rule 61 Mot. at 5; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 32-33.

[39] Def.'s Resp. to 61(e)(7) Mot. at 1-2; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 26-31; Def.'s Supp. to Am. Rule 61 Mot. at 9-21.

[40] Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 44-49.

[41] Def.'s Rule 61 Mot. at 5; Def.'s Am. Rule 61 Mot. at 4; Def.'s Mem. on Am. Rule 61 Mot. at 50-52; Def.'s Reply Br. at 1-24.

### B. **PCR Claim No. Two** – **IAC Trial Counsel (Miscellaneous)**

1. Trial Counsel failed to engage in proper pre-trial investigation and present an adequate trial defense.[42]

2. Trial Counsel failed to call a gunshot residue or "shot/trauma" expert.[43]

3. Trial Counsel failed to object to victim's dying declarations.[44]

4. Trial Counsel prohibited Mr. Thomas from testifying.[45]

### C. **PCR Claim No. Three** – **IAC Appellate Counsel (Miscellaneous)**

1. Appellate Counsel should have argued more than sufficiency of evidence as basis for reversal.[46]

2. Appellate Counsel should have argued IAC of Trial Counsel.[47]

3. Appellate Counsel made an improper concession at oral argument.[48]

### D. **PCR Claim No. Four** – **Prosecutorial Misconduct/Closing Argument**

### E. **PCR Claim No. Five** – **"Newly Discovered Evidence"**[49]

### F. **PCR Claim No. Six** – **Cumulative Error**[50]

For the reasons now explained, none of the claims Mr. Thomas has asserted

---

[42] Def.'s Resp. to 61(e)(7) Mot. at 2; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 32-34; Def.'s Supp. to Am. Rule 61 Mot. at 1-8.

[43] Def.'s Rule 61 Mot. at 3-4.

[44] Def.'s Supp. to Am. Rule 61 Mot. at 22-25.

[45] Def.'s Resp. to 61(e)(7) Mot. at 2.

[46] Def.'s Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 50-52.

[47] Def.'s Rule 61 Mot. at 3.

[48] *Id.*; Def.'s Mem. on Am. Rule 61 Mot. at 50.

[49] Def.'s Am. Rule 61 Mot. at 4; Def.'s Mem. on Am. Rule 61 Mot. at 52-62.

[50] Def.'s Mem. on Am. Rule 61 Mot. at 70-72.

in his motion for postconviction relief (or his many supplements) warrant relief under this Court's Rule 61.

**LEGAL STANDARDS**
**APPLICABLE TO INEFFECTIVENESS CLAIMS**

A claim of ineffective assistance of counsel is reviewed under the familiar two-part *Strickland* test.[51] One asserting ineffective assistance of trial counsel must demonstrate that: (i) his defense counsel's representation fell below an objective standard of reasonableness, and (ii) there is a reasonable probability that, but for counsel's errors, the result of his trial proceedings would have been different.[52]

For the first prong, deficient performance, the burden is on the claimant to show that counsel's conduct fell below an objective standard of reasonableness, "*i.e.*, that no reasonable lawyer would have conducted the defense as his lawyer did."[53] There is a strong presumption that counsel's representation was reasonable;[54] "[i]t is not this Court's function to second-guess reasonable . . . tactics" engaged by trial

---

[51] *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *Neal v. State*, 80 A.3d 935, 946 (Del. 2013).

[52] *Strickland*, 466 U.S. at 688-94; *see also Alston v. State*, 2015 WL 5297709, at *3 (Del. Sept. 4, 2015).

[53] *Green v. State*, 238 A.3d 160, 174 (Del. 2020) (citing *Burger v. Kemp*, 483 U.S. 776, 791 (1987)).

[54] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

counsel.[55] And when assessing the reasonableness of counsel's conduct, the Court considers "not what is possible or what is prudent or appropriate, but only what is constitutionally compelled."[56]

An ineffective assistance claim targeting appellate counsel is also reviewed under *Strickland*.[57] When claiming ineffective assistance of appellate counsel, however, one "must show a reasonable probability that, but for his counsel's unreasonable failure to [press a particular claim], he would have prevailed on his appeal."[58]

Now for either, "[t]he likelihood of a different result must be substantial, not just conceivable."[59] And while the "objective inquiry is not mathematically precise," there can only be a finding of the required prejudice "when there is a substantial likelihood—*i.e.*, a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance."[60]

---

[55] *State v. Drummond*, 2002 WL 524283, at *1 (Del. Super. Ct. Apr. 1, 2002).

[56] *Green*, 238 A.3d at 174 (quoting *Burger*, 483 U.S. at 794).

[57] *Neal*, 80 A.3d at 946).

[58] *Id.* at 947 (quoting *Smith v. Robbins*, 528 U.S. 259, 285 (2000)).

[59] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)); *see Strickland*, 466 U.S. at 693 ("It is not enough for the [postconviction movant] to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (citation omitted)).

[60] *Baynum v. State*, 211 A.3d 1075, 1084 (Del. 2019) (citing *Harrington*, 562 U.S. at 112).

So, at some point for a postconviction movant to be successful under *Strickland*, the Court "must consider the totality of the evidence, and must ask if the movant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors" he alleges counsel made.[61] "This measure of prejudice is the same whether the ineffectiveness charge is aimed at trial or direct appeal counsel."[62]

A movant must prove **both** deficient attorney performance **and** resulting prejudice to succeed in making an ineffective assistance of counsel claim. Failure in the first instance to prove either will doom his claim, and the Court need not address the other.[63] Put another way, "if the Court finds that there is no possibility of prejudice even if a defendant's allegations regarding counsel's representation were true, the Court may dispose of the claim on this basis alone."[64]

---

[61] *Dale v. State*, 2017 WL 443705, at *2 (Del. Jan. 31, 2017) (cleaned up).

[62] *State v. Mayfield*, 2024 WL 4586540, at *8 (Del. Super. Ct. Oct. 28, 2024) (citing *Neal*, 80 A.3d at 946 ("When evaluating an appellate counsel's conduct for ineffective assistance, we apply the same *Strickland* framework.") and *Ploof v. State*, 75 A.3d 811, 831 (Del. 2013) ("Although the United States Supreme Court developed the *Strickland* test to evaluate trial counsel, we also apply the *Strickland* test to evaluate appellate counsel's performance.")).

[63] *Strickland*, 466 U.S. at 697; *Ploof*, 75 A.3d at 825 ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant" (citation omitted)); *State v. Hamby*, 2005 WL 914462, at *2 (Del. Super. Ct. Mar. 14, 2005).

[64] *State v. Manley*, 2014 WL 2621317, at *7 (Del. Super. Ct. May 29, 2014); *Green*, 238 A.3d at 174-75 ("We may dispose of an ineffective-assistance claim based on the absence of sufficient prejudice without addressing the performance prong if, in fact prejudice is lacking."); *Strickland*, 466 U.S. at 691 ("an error by counsel, even if professionally unreasonable, does not warrant setting aside the criminal judgment if the error had no effect").

## ANALYSIS OF
## MR. THOMAS'S POSTCONVICTION CLAIMS

Mr. Thomas voices certain complaints as standalone claims of trial error or due process violations. Most often, he then goes on to fault his prior counsel for failing to champion those arguments at trial or on direct appeal. As a practical matter then, to determine whether Mr. Thomas has been prejudiced because his trial or appellate attorney failed to make a particular objection, press an individual issue, or raise any specific argument on appeal, the Court many times begins and ends its examination by determining the now complained-of issue's merits.[65] This is because counsel can never be deemed *Strickland* ineffective for failing to make an otherwise futile or inconsequential argument.[66]

### A. PCR CLAIM NO. ONE – ADMISSION OF SHOTSPOTTER EVIDENCE

In November 2017, the State sent the defense two ShotSpotter analyses.[67] In the first, the analyst concluded that the initial five of the ten shots detected were fired from the street in front of the Hale residence.[68] The second analyst found: (a) that those first five shots were fired from the sidewalk directly in front of Mr.

---

[65] *See generally Ploof*, 75 A.3d at 832-33.

[66] *Peters*, 283 A.3d at 680; *State v. Prince*, 2022 WL 211704, at *7 (Del. Super. Ct. Jan. 24, 2022) (collecting cases).

[67] DI 19. The State had been granted a 30-day extension to complete all discovery including any additional expert reports. A-110b-110c.

[68] A-227-237.

Hale's house; (b) three shots were then fired from the Hales' lawn; and (c) two more shots were fired from the lawn directly adjoining the Hales' home.[69]

In February 2018, Trial Counsel requested an extension of the since-passed December deadline for expert reports and motions related to those ShotSpotter analyses.[70] Counsel made clear that she was not then requesting a trial continuance.[71]

The Court granted the defense request and set a new March 5th deadline for expert reports or motions.[72] Meanwhile, jury selection remained scheduled for April 17, 2018; trial was to begin the next week.[73]

On March 5, 2018, Trial Counsel filed a comprehensive motion *in limine* to summarily exclude the ShotSpotter evidence, or alternatively, for a *Daubert* hearing.[74] That comprehensive motion argued that the ShotSpotter evidence was "both intrinsically and extrinsically unreliable," had an "unacceptably high error rate," and lacked acceptance within the scientific community.[75] Trial Counsel also challenged the ShotSpotter evidence because "it purports to pinpoint an *exact*

---

[69] A-238-248.

[70] A-110d-110e.

[71] *Id*.

[72] *Id*.

[73] *See* A-110a.

[74] D.I. 25; A-116-130 (Motion without the inch-thick set of exhibits).

[75] *Id.*

*location that a gun was fired* or the *order of the firing of those gunshots.*" In Trial Counsel's view, while "ShotSpotter technology provides *some* objective basis for detecting sounds which are (or are similar to) gunshots, it is necessary for an actual human being to listen to the audio recording to make a determination as to whether or not the sounds which were recorded are in fact gunshots," and thus, "there is a subjective component to ShotSpotter evidence which depends upon the skill and ability of the individual who 'makes the call' who may be cognitively biased [given that] [a]ll of the persons who listen to the ShotSpotter audio recordings are employed by or aligned with law enforcement."[76]

By that time, Trial Counsel had also retained two experts to testify at any potential *Daubert* hearing—both had been involved in an earlier challenge of ShotSpotter in California.[77]

Three days after its filing, the Court addressed the *Daubert* motion at an office conference. The State confirmed then that the ShotSpotter analyses were "probably . . . a critical piece of evidence in the State's case."[78] The Court instructed the parties to confer on hearing logistics and then contact chambers for scheduling.[79] Trial Counsel, noting the looming trial date, acknowledged the probable length of a

---

[76] *Id.* (emphasis in original).

[77] A-138; A-142; A-150.

[78] A-137.

[79] *Id.*

*Daubert* hearing and the now-compressed schedule.[80]

The parties and Court next addressed the ShotSpotter motion the following week via teleconference. Given that the issue was of first impression in Delaware, the admissibility issue's complexity, and that trial was imminent, the Court was concerned with the defense-proposed tight scheduling of a *Daubert* hearing. So, the Court proposed rescheduling the trial to a date in mid-June or shortly thereafter.[81] The Court then queried the parties on whether the trial date would have to be moved to properly accommodate a *Daubert* hearing and the Court's decision on "a crucial piece of evidence for both sides and their ability to either present or attack it."[82]

The State agreed that if a *Daubert* hearing was needed, a continuance was necessary.[83] But Trial Counsel was concerned that Mr. Thomas was held only on this murder charge and, thus, would not want any continuance "significantly past June."[84] Understanding this, the Court said it would set the earliest practicable new trial date.[85]

At that point, Trial Counsel asked to keep the April 23rd trial date until she met with Mr. Thomas in the ensuing few days and determined whether he

---

[80] A-138.

[81] A-145-147, A-157.

[82] A-147-153.

[83] A-158.

[84] A-158-159.

[85] A-160.

preferred to forgo the *Daubert* motion knowing that the ShotSpotter evidence would be admitted but challenged via cross-examination.[86]  The Court agreed, but also instructed the parties to agree upon a new potential trial date so Trial Counsel had that solid alternative date when she conferred with Mr. Thomas on how they wanted to proceed on the *Daubert* motion.[87]

On March 20, 2018, Trial Counsel wrote that she "spoke at length with [Mr. Thomas] . . . regarding the *Daubert* motion and the potential for the trial to be continued to July if we move forward with the *Daubert* hearing."[88] She reported that "[i]n consideration of being able to move to trial more quickly and keep the previously scheduled April trial date, [Mr. Thomas] will withdraw the *Daubert* motion."[89]

On March 26, 2018, the Court held a status conference to make record of the defense's withdrawal of the *Daubert* motion with Mr. Thomas present.[90]  At that conference, Trial counsel recounted what she had written earlier, explaining that she and Mr. Thomas fully discussed the *Daubert* motion and that he understood that he could have a *Daubert* hearing but that would occasion a trial delay.[91]  It was

---

[86]  A-162-163.

[87]  A-163-164.

[88]  A-166.

[89]  *Id.*; A-167 (Trial Counsel's second letter of the same date recounting the same).

[90]  A-192-193.

[91]  A-193-194; A-166, A-167.

Mr. Thomas's and his counsel's decision that they wished to keep the April trial date and challenge the ShotSpotter witness then.[92]

The Court then heard from Mr. Thomas directly.  He confirmed that he had spoken to Trial Counsel regarding the situation, he understood the strategy she would use to attack the ShotSpotter evidence, and that he had had enough time to discuss the pros and cons of withdrawing the *Daubert* motion and moving forward with trial as planned.[93]

The Court then ruled that the *Daubert* motion was moot as withdrawn for the reasons given at that conference and in Trial Counsel's earlier letters.[94]

**1. The Court didn't prevent a *Daubert* challenge of ShotSpotter evidence.[95]**

Mr. Thomas insists that the Court abused its "judicial authority when [it] impeded upon the defendant's ability to properly communicate and strategize with trial counsel" regarding the *Daubert* motion and hearing.[96]  Specifically, Mr. Thomas points to the March 15, 2018 status conference where the Court instructed the parties to confer and pick a potential new trial date that would allow

---

[92]  A-194.

[93]  A-195.

[94]  A-196. *See* A-166, A-167.

[95]  Def.'s Am. Rule 61 Mot. at 4; Def.'s Mem. on Am. Rule 61 Mot. at 63-69.

[96]  Def.'s Mem. on Am. Rule 61 Mot. at 65.

adequate time for the proposed *Daubert* proceedings.[97] According to Mr. Thomas, the Court's "orders prohibited trial counsel from informing [him] fully on the facts and the law, and advising [him] with complete candor concerning all aspects of the case."[98] In making this claim, Mr. Thomas fixates on and misinterprets one statement made by the Court during that March 15th conference.

This is one that Mr. Thomas raises as a standalone claim of error—labeling it as a "violation of the XIV Amendment."[99] In that light, it would be barred by Rule 61(i)(3). Mr. Thomas failed to raise this claim at trial or on appeal. Such procedural default is fatal unless he can show cause and prejudice under Rule 61(i)(3) or that a Rule 61(i)(5) exception applies. But Mr. Thomas hasn't alleged a cause for his default. He cites no external factor that prevented him from raising this claim at trial or on appeal—though as discussed earlier and below it is somewhat subsumed in his IAC allegations related to the handling of the ShotSpotter issues. And, most directly, he can't demonstrate any actual prejudice.

During the March 15, 2018 teleconference Trial Counsel asked to keep the April 23rd trial date until she conferred with Mr. Thomas four days later. She explained why:

> I have a scheduled meeting time to meet with my client on

---

[97] *Id.* at 65-69.

[98] *Id.* at 69.

[99] Def.'s Am. Rule 61 Mot. at 4.

Monday at Howard R. Young where he has been.  If my client would prefer -- I would like to discuss this with him -- if he would prefer to go, because he's very anxious to go to trial, I'm sure of that -- if my client would prefer to not go forward on the *Daubert* knowing that the ShotSpotter information could come in against him just as regular, as it normally would with cross-examination, can I let the Court know that on Monday?

Because, frankly, if he's adamant that he wants to go to trial, and we talk through those issues and what that is, he may want to keep the  trial date without it, and I really would  like to discuss that with him.  So I was wondering if your Honor would let us keep the April date for now, and I can report back to the Court on -- I literally have an hour to meet with him between ten and 11 on Monday, so I should be able to report back by 11:30 on Monday whether or not we want to forego the *Daubert* motion on the ShotSpotter or whether we want to go forward on that.  So I'm asking if that would be okay?[100]

The Court agreed:

That would be fine.  I mean, if we can keep the trial date as we are, I will.  But look, I don't want you to, you know, you talk to your client about and strategize with him about what is best, I mean, you know, maybe a *Daubert* hearing isn't, maybe cross-examination of experts is, that's certainly one accepted means of dealing with expert testimony.  But, sure, I'm not going to make -- I am not going to make a final decision on whether to pull the plug on the trial date and change it until we see how long that time is and things like  that.[101]

It's the transcription of the Court's self-interrupted thought at the beginning

the second sentence—*i.e.*, "But look, I don't want you to"—on which Mr. Thomas

---

[100]  A-162-163.

[101]  A-163.

hyperfixates when insisting that the Court improperly limited his counsel's communication with him. But that read has been singularly his and not at all consistent with any other case participant's understanding or with what occurred thereafter.[102]

Immediately thereafter, when Trial Counsel expressed that she was "hoping to defer" confirming any new potential trial date until after she spoke to Mr. Thomas, the Court instructed the two parties to arrive at a new potential trial date with chambers that same day. The Court wanted Trial Counsel to have that important information when she conferred with Mr. Thomas regarding their options on the *Daubert* issue.[103]

---

[102] As our Supreme Court has recently recognized, in some instances, "crediting of the court reporter's punctuation of [a] trial judge's ruling" can muddy the understanding a bit. *See Strickland v. State*, 2024 WL 4366794, at *10 (Del. Oct. 2, 2024). The passage of concern to Mr. Thomas is probably clearer with the following punctuation:

> That would be fine. I mean, if we can keep the trial date as we are, I will. But look, I don't want you to, you know[. . . . Y]ou talk to your client about and strategize with him about what is best, I mean, you know, maybe a *Daubert* hearing isn't, maybe cross-examination of experts is, that's certainly one accepted means of dealing with expert testimony. But, sure, I'm not going to make -- I am not going to make a final decision on whether to pull the plug on the trial date and change it until we see how long that time is and things like that.

[103] A-163-164:

> No, I want you all to try and solidify some dates today so that when you talk to your client, you can say, well, you know, for a potential successful attack and excluding this evidence, is, you know, two months or three months really worth it. So that's why, you know, I want you to have the information you can about when the potential trial date is so when you speak to him. So, I want that conversation between counsel and my chambers to happen now so that we have some realistic dates out there.

The Court never precluded Trial Counsel from discussing the *Daubert* motion and strategizing with Mr. Thomas on how to proceed thereon. Rather, the record reveals that the Court encouraged Trial Counsel to confer with Mr. Thomas having all the pertinent information related to the choice they then faced: attack the ShotSpotter evidence via full *Daubert* proceedings that would delay the impending trial (and precisely how long that delay might be); *or* forego the *Daubert* contest and challenge the unfavorable bits of the ShotSpotter evidence at then-scheduled trial. And the record confirms that was indeed Trial Counsel's understanding.

Because on March 20, 2018, Trial Counsel informed the Court that she had spoken "at length with [Mr. Thomas] . . . regarding the *Daubert* motion and the potential for the trial to be continued to July if we move forward with the *Daubert* hearing."[104] In another filing the same day she expounded: "I spoke with my client this morning at length and he would like to keep the April trial date. . . . the defense understands that we will not be having a *Daubert* hearing and the State will not be calling any additional [ShotSpotter] experts. I have spoke with my client in detail about this decision . . ."[105]

At the March 26th hearing, Trial Counsel confirmed—with Mr. Thomas beside her—that she "explained to him that we could go forward with the

---

[104] A-166.

[105] A-167.

*Daubert* hearing, that [the Court] was not only prepared to do that but that we actually has a second trial date in the middle of July."[106] She made it clear that after consultation with her, Mr. Thomas—"with his eyes wide open"—wanted to withdraw the *Daubert* challenge.[107] And Trial Counsel added that, with her alternative strategy of addressing the ShotSpotter evidence in mind, she supported Mr. Thomas's decision.[108]

In a colloquy with the Court, Mr. Thomas confirmed all this.[109] As does the now-expanded postconviction record. Trial Counsel now acknowledges not only that she in no way felt hindered from fully advising Mr. Thomas on the ShotSpotter/*Daubert* issue before they withdrew the motion *in limine*, but that in fact she did.[110]

And, as discussed further now, this background is precisely why Mr. Thomas's direct appeals and postconviction counsel recognized the emptiness of any claim related to the admission of the ShotSpotter evidence at his trial;[111] he knowingly forfeited the issue.

---

[106] A-193-194. The backup trial date selected was July 16, 2018. A-168.

[107] A-194.

[108] *Id.*

[109] *Id.*

[110] Trial Counsel's Supp. Aff. at 1.

[111] *See* App. Counsel's First Aff. at 3; PCR Counsel's Mot. to Withdraw Br. at 33-34.

**2. Trial Counsel's tactical decision—knowingly assented to by Mr. Thomas—to allow admission of and to herself use the ShotSpotter evidence was objectively reasonable.**[112]

Mr. Thomas says his trial counsel was ineffective for "fail[ing] to object to shottspotter [sic] coming into evidence," for withdrawing the related *Daubert* motion,[113] and for failing to "properly advise him about the pros and cons of having a *Daubert* hearing as opposed to cross-examine at trial."[114]

"*Strickland* doesn't deem . . . counsel ineffective for not pursuing the best or most successful strategy; instead, it requires trial[] counsel be informed by a thorough investigation of law and facts."[115] Indeed, an attorney's strategic or tactical choices made after thorough investigation of the relevant law and facts are virtually unchallengeable.[116]

Recall, Trial Counsel was fully prepared to and had taken significant affirmative steps in a bid to exclude the ShotSpotter evidence. She ultimately made a strategic decision to forego the already-filed *Daubert* motion in order to keep the trial date and to use what could be critically helpful aspects of the

---

[112] Def.'s Rule 61 Mot. at 5; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 32-33.

[113] Def.'s Rule 61 Mot. at 5.

[114] Def.'s Mem. on Am. Rule 61 Mot. at 32-33.

[115] *Peters*, 283 A.3d at 687 (citing *Burns v. State*, 76 A.3d 780, 788 (Del. 2013); *Hoskins*, 102 A.3d at 730).

[116] *Green*, 238 A.3d at 174.

ShotSpotter analyses. She explains how she arrived there:

> I discussed with Defendant the option of pursuing a *Daubert* hearing regarding the admissibility of ShotSpotter evidence or, in the alternative, keeping the pending trial date with the understanding that I would cross-examine the State's ShotSpotter expert regarding the two conflicting reports filed by their corporation. The first report clearly supports the defense that a drive-by shooter fired the shots that fatally wounded the decedent because the report placed those shots *as coming from the street*. The *later* report prepared by Paul Greene directly conflicted with the initial ShotSpotter report and instead placed the shots as coming from the sidewalk area where Defendant had been shot by the decedent, thus bolstering the State's case.[117]

And at trial, Trial Counsel was prepared to and did attack the ShotSpotter evidence.[118] She cross-examined Mr. Greene regarding the inconsistent results in the two ShotSpotter reports and focused on the earlier, more favorable report written by the initial analyst, Simone Ellison, that suggested that the initial shots came from the street.[119] She got Mr. Greene to agree that Ms. Ellison's report placed several of the detected shots coming from the middle of the street and other shots closer to the sidewalk.[120] Trial Counsel delved into Mr. Greene's history of testifying and some of his particular cases.[121] She also asked him of his familiarity with other jurisdictions' negative treatment of ShotSpotter evidence and questioned

---

[117] Trial Counsel's Supp. Aff. at 1 (emphasis in original).

[118] A-658-688; A-1099, 1012.

[119] A-658-660.

[120] A-658-659.

[121] A-661-664.

Mr. Greene about the reliability of ShotSpotter technology.[122]  And during closing, she urged the jury to accept the results of the Ellison report—which had the likely fatal shots coming from the street—to argue that the ShotSpotter evidence was consistent with the defense theory of a drive-by shooting and that Thomas was not the shooter.[123]

This strategy could have been engaged by counsel with or without Mr. Thomas's assent.  "When a defendant is represented by counsel, the authority to manage the day-to-day conduct of the defense rests with the attorney."[124]

Still, "[c]ounsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty . . . . From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions[.]"[125]  It's clear here that Trial Counsel did just that and her choices were both reasonable strategy

---

[122]  A-669-679.

[123]  A-658-688; A-1099, 1012.

[124]  *Cooke v. State*, 977 A.2d 803, 840-41 (Del. 2009) ("Specifically the defense attorney 'has the immediate and ultimate responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop.'") (quoting *Wainwright v. Sykes*, 433 U.S. 72, 93 n.1 (1977)); *see also* Jean K. Gilles Phillips, and Joshua Allen, *Who Decides: The Allocation of Powers Between the Lawyer and the Client in a Criminal Case?,* 71 J. KAN. BAR ASS'N 28, 29 (2002) (citing *Wainwright*, 433 U.S. at 93 n.1) ("[T]he United States Supreme Court [has] held that the attorney possesses the right to decide certain strategic and tactical decisions, including what witnesses to call, whether and how to conduct cross-examination, what trial motions should be made, and what evidence should be introduced.").

[125]  *Strickland*, 466 U.S. at 688.

and consistent with Mr. Thomas's express objective. Mr. Thomas can't complain now that his attorney should have rejected his express instruction to forego the *Daubert* challenge to the ShotSpotter evidence and move forward with the immediate trial date or be deemed to have provided constitutionally deficient representation simply because the informed and agreed-to tactic failed.[126] On this basis alone, Mr. Thomas's claim of ineffective assistance fails.[127]

Though too, Mr. Thomas has done nothing to demonstrate the prejudice needed to succeed on this ineffectiveness claim. In shouldering his prejudice burden, Mr. Thomas must demonstrate "there is a substantial likelihood—*i.e.*, a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance."[128] For Mr. Thomas here that would mean that he would at very least have to demonstrate a meaningful chance that had counsel tried to wholly exclude the ShotSpotter evidence on a *Daubert* challenge she would have been able to do so.

---

[126] *Coverdale v. State*, 2018 WL 259775, at *5 (Del. Super. Ct. Jan. 2, 2018). Nor can the Court find a *Strickland*-level conduct deficiency in such a circumstance. *See Taylor v. State*, 32 A.3d 374, 381 (Del. 2011) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") (quoting *Strickland*, 466 U.S. at 689).

[127] *Strickland*, 466 U.S. at 687 (finding that to succeed on his claim of ineffective assistance of counsel, an inmate must satisfy both prongs of the *Strickland* test); *State v. McGlotten*, 2011 WL 987534, at *4 (Del. Super. Ct. Mar. 21, 2011) ("If a defendant cannot establish both [*Strickland*] prongs, then the ineffective assistance of counsel claim fails.").

[128] *Baynum*, 211 A.3d at 1084 (citing *Harrington*, 562 U.S. at 112).

-30-

By this measure, Mr. Thomas has failed to satisfy *Strickland*'s prejudice showing.[129]

### 3. The State did not offer "perjured" testimony from ShotSpotter expert.[130]

Mr. Thomas says that the State violated his due process rights when "[t]he prosecutor allowed, solicited, and encouraged false testimony from the State's key witness, Paul Greene of Shotspotter."[131] He also charges Trial Counsel with ineffectiveness for "fail[ing] to object to and/or strike Paul Greene's testimony and request mistrial."[132]

According to Mr. Thomas, Mr. Greene committed "perjury" because there were inconsistencies between his direct and cross-examinations regarding the nature and extent of his contact with the State before authoring his ShotSpotter report.[133] He goes on that this "perjury" "sever[e]ly prejudiced" his trial because the State never expressly addressed the inconsistencies, so the jury never knew of the "false testimony" during their deliberations.[134]

---

[129] *See Neal*, 80 A.3d at 942 ( ("*Strickland* requires more than a showing merely that the conduct could have, or might have, or it is possible that it would have led to a different result.") (cleaned up). *See also J.A.R. v. State*, 374 So. 3d 25, 30 (Fla. Dist. Ct. App. 2023) (upholding trial court's denial of a motion to exclude ShotSpotter evidence after a full *Daubert* hearing).

[130] Def.'s Resp. to 61(e)(7) Mot. at 1-2; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 26-31; Def.'s Supp. to Am. Rule 61 Mot. at 9-21.

[131] Def.'s Am. Rule 61 Mot. at 3; Def.'s Resp. to 61(e)(7) Mot. at 1-2; Def.'s Mem. on Am. Rule 61 Mot. at 26-31.

[132] Def.'s Supp. to Am. Rule 61 Mot. at 9.

[133] Def.'s Mot. in Lim. on Am. Rule 61 Mot. at 26-31.

[134] *Id.* at 28-29. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the

Mr. Thomas's freestanding prosecutorial misconduct claim on this issue was never raised at trial or on appeal, so it is barred by Rule 61(i)(3).[135]

But even were the Court to examine this claim on the merits—as might inform whether Mr. Thomas could demonstrate the required actual prejudice required under Rule 61(i)(3)'s cause-and-prejudice test[136] or the earlier-explained *Strickland* test for ineffectiveness—it still fails. No "perjury" occurred here.

The Court has examined the exchanges Mr. Thomas now complains-of. As the Court reads and recollects them, it was clear that Trial Counsel, the witness, and the prosecutor largely spoke past each other on how and why Mr. Greene first came to substitute for Ms. Ellison, generate his own report, and testify at trial.[137] That said, Trial Counsel was able to exploit any inconsistencies via cross-examination

---

State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.").

[135] *Reeder v. State*, 2006 WL 1210986, at *2 (Del. May 3, 2006) (finding that movant's claims of "perjury" by witness, subornation of perjury by the prosecutor, and related abuse of discretion by trial judge were barred by Rule 61(i)(3) when raised for the first time on postconviction).

[136] *See State v. Gregg*, 2021 WL 2580713, at *7 (Del. Super. Ct. June 23, 2021), *aff'd*, 2022 WL 881077 (Del. Mar. 24, 2022) ("And to demonstrate actionable prejudice, the movant must show that there was a substantial likelihood that, had the claim been raised, the outcome of the case would have been different.") (internal quotation marks and citation omitted); *see also Flamer v. State*, 585 A.2d 736, 748 (Del. 1990) (stating that to succeed on the element of prejudice required under Rule 61(i)(3)'s cause-and-prejudice test, one must show that there was a "substantial likelihood" that, if he earlier pressed the now-defaulted claim, the outcome of his case would have been different).

[137] A-669-679. The same for Mr. Greene's testimony relating to his *own* experience in California criminal cases. Def.'s Mem. on Am. Rule 61 Mot. at 29-30. *See* A-662-664.

and during closing.[138]

Any lack of clarity or suggested internal contradictions in Mr. Greene's testimony come nowhere close to "perjury"[139] or "false testimony;" Trial Counsel fully laid out the lack-of-credibility charge she had leveled at Mr. Greene and the jury was unimpeded in considering it.[140]

### 4. No error in rulings on certain cross-examination of Shotspotter expert.[141]

Mr. Thomas insists the Court "violated [his] confrontation clause of the Sixth Amendment, when trial counsel was prohibited from showing prototypical form of bias on the part of expert witness, Paul Greene, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability

---

[138] A-658-688; A-1099, 1012.

[139] *See* DEL. CODE ANN. tit. 11, §§ 1221-23 (2024) (defining perjury as "swear[ing] falsely"). And defining swearing falsely as:

> A person 'swears falsely' when the person intentionally makes a false statement or affirms the truth of a false statement previously made, knowing it to be false or not believing it to be true, while giving testimony . . . ."

*Id.* at § 1224. *See Lambert v. Blackwell*, 387 F.3d 210, 249 (3d Cir. 2004) ("Discrepancy is not enough to prove perjury. There are many reasons testimony may be inconsistent; perjury is only one possible reason."); *State v. Jones,* 2005 WL 2249525, at *2 (Del. Super. Ct. Sept. 8, 2005) ("The mere allegation that the witness gave testimony inconsistent with a prior statement does not necessarily amount to perjury.").

[140] A-658-688; A-1099, 1012. *See Romeo v. State*, 2011 WL 1877845, at *3 (Del. May 13, 2011) ("[M]ere contradictions in a witness's testimony may not require reversal because those contradictions may not constitute knowing use of false or perjured testimony. Rather, mere contradictions in trial testimony establish a credibility question for the jury." (citations omitted)).

[141] Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 43-49.

of the witness."[142] In essence, Mr. Thomas says that the Court imposed an improper limit on certain cross-examination of Mr. Greene.

Again, as a standalone claim, this "abuse-of-discretion" allegation was never raised at trial or on appeal, so it is barred as such by Rule 61(i)(3). And again, were the Court to examine its merit—as it might have to under Rule 61(i)(3)'s cause-and-prejudice test[143] or *Strickland's* IAC test[144]—Mr. Thomas would get no further. The now-challenged evidentiary rulings themselves were "prototypical" and correct.

Upon a Rule 403 objection, the Court limited only certain inquiry regarding the testimonial practices of other ShotSpotter analysts and specific admissibility rulings in other jurisdictions that Mr. Greene had no personal knowledge of.[145] As proffered, the evidence about what happened in ShotSpotter cases in other jurisdictions would require additional testimony about the actual evidence and circumstances thereof. The Court was rightly concerned that it would divert either into a mini-trial of another court's ruling or cause Trial Counsel to offer her own testimony as to what occurred elsewhere.[146] With that in mind, the

---

[142] Def.'s Mem. on Am. Rule 61 Mot. at 48-49.

[143] *See Gregg*, 2021 WL 2580713, at \*7; *Flamer*, 585 A.2d at 748.

[144] *Peters*, 283 A.3d at 689 (Movant "must establish . . . that actual deficiencies in the attorney's representation caused him substantial prejudice. . . . The prejudice required is defined as a reasonable probability that but for counsel's errors, the result of his trial would have been different.").

[145] A-666-669.

[146] *Id.*

Court did not wholly prohibit, but did properly tailor, the inquiries allowed thereon.[147] Such Rule 403 rulings have long been common and recognized as appropriate in Delaware.[148]

### 5. Appellate Counsel wasn't ineffective in eschewing Mr. Thomas's current ShotSpotter evidence complaints.[149]

Mr. Thomas says his direct appeals attorney was constitutionally ineffective for failing to raise any of these Shotspotter issues.[150]

As mentioned before, Appellate Counsel's representation is also measured using the *Strickland* yardstick.[151] Appellate Counsel wasn't required to raise "every

---

[147] A-666-669.

[148] *E.g.*, *Bryant v. State*, 1999 WL 507300, at *2 (Del. June 2, 1999) ("[C]onfusion of issues, implicates, in part, the . . . concerns addressed under D.R.E. 403—the danger of a mini-trial."); *Tilghman v. Delaware State Univ.*, 2014 WL 703869, at *3 (Del. Super. Ct. Feb. 10, 2014) ("As the State Defendants correctly argue, presentation of these reports would likely lead to mini-trials about each incident. . . . Presentation of these incidents would just needlessly prolong the trial, have very little probative value, and thus the . . . reports should also be excluded pursuant to D.R.E. 403."); *Laugelle v. Bell Helicopter Textron, Inc.*, 2014 WL 5038142, at *12 (Del. Super. Ct. Oct. 6, 2014) ("[T]he evidence . . . invites the danger of a mini-trial on that issue, thus misleading and confusing the jury."); *State v. Ellerbe*, 2016 WL 4119863, at *4, n.36 (Del. Super. Ct. Aug. 2, 2016) (noting that trial counsel's decision to forego seeking admission of certain impeachment evidence appropriate under Rule 403 as "the probative value would be substantially outweighed by the danger of unfair prejudice in this particular case, mainly confusing the issues and really trying to have some mini-trial of [the other] matter"). *See also State v. Long*, 1992 WL 207258, at *7 (Del. Super. Ct. July 23, 1992) ("The unfair prejudice contemplated by D.R.E. 403 means an undue tendency to suggest a decision should be made on an improper basis such as an emotional one, one characterized to shift the jury's focus away from the incident in issue or to create risk of a mini-trial thereby unnecessarily wasting time.").

[149] Def.'s Rule 61 Mot. at 5; Def.'s Am. Rule 61 Mot. at 4; Def.'s Mem. on Am. Rule 61 Mot. at 50-52; Def.'s Reply Br. at 1-24.

[150] *Id.*

[151] *Neal*, 80 A.3d at 946 ("When evaluating an appellate counsel's conduct for ineffective assistance, we apply the same *Strickland* framework."); *Ploof*, 75 A.3d at 831 ("Although the United States Supreme Court developed the *Strickland* test to evaluate trial counsel, we also apply

-35-

nonfrivolous issue."[152]   Nor should she have pressed what were otherwise futile or inconsequential arguments.[153]   Rather, Mr. Thomas "can only show that his appellate counsel ineffectively represented him where the attorney omit[ted] issues that are clearly stronger than those the attorney presented."[154]

The record reflects that Appellate Counsel considered the ShotSpotter issues and declined to raise them for good reason[155]—far from deficient appellate-counsel conduct, it is that expected of an effective appellate attorney.[156] What's more, to determine whether Mr. Thomas was prejudiced because his attorney failed to raise any specific issue on appeal, the Court might begin and end its *Strickland* examination by considering each omitted issue's merits.[157]   As shown above, Mr. Thomas has failed on each issue he now says Appellate Counsel should have raised on direct appeal.

---

the *Strickland* test to evaluate appellate counsel's performance.").

[152] *Ploof*, 75 A.3d at 831 (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983); *Watson v. State*, 1991 WL 181468, at *3 (Del. Aug. 22, 1991) ("Appellate counsel is not constitutionally required to raise all non-frivolous claims on direct appeal.).

[153] *Peters*, 283 A.3d at 680.

[154] *Ploof*, 75 A.3d at 831.

[155] App. Counsel's First Aff. at 3 (explaining that Appellate Counsel recognized the waiver of the ShotSpotter admissibility issues and that as it came in, that one interpretation of that evidence was helpful both at trial because it supported the drive-by shooting theory and on appeal because it supported her insufficiency of evidence argument); App. Counsel's Supp. Aff. at 3-4 (explaining the futility of the other ShotSpotter issues).

[156] *Barnes*, 463 U.S. at 751-52; *Smith v. Murray*, 477 U.S. 527, 536 (1986).

[157] *Ploof*, 75 A.3d at 832-33.

**B. PCR CLAIM NO. TWO – IAC TRIAL COUNSEL (MISCELLANEOUS)**

Mr. Thomas raises other complaints regarding Trial Counsel's performance. All are either belied by the trial and postconviction record or unsupported by applicable the law.

### 1. Trial Counsel did engage in a pre-trial investigation and presented an objectively reasonable trial defense.[158]

Mr. Thomas says his trial counsel failed to conduct an adequate pre-trial investigation[159] and failed to present a defense for the charges against him.[160] The record simply does not support this claim.

As is already apparent from the discussion above, Trial Counsel researched and investigated Mr. Thomas's case exhaustively when preparing his defense. This included trying to locate some of the very evidence and witnesses Mr. Thomas now believes should have been presented.[161] And at trial, Trial Counsel vigorously pursued the identity defense that Mr. Thomas still champions.

---

[158] Def.'s Resp. to 61(e)(7) Mot. at 2; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 32-34; Def.'s Supp. to Am. Rule 61 Mot. at 1-8.

[159] Def.'s Supp. to Am. Rule 61 Mot. at 1-8.

[160] *Id.;* Def.'s Resp. to 61(e)(7) Mot. at 2; Def.'s Am. Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 32-34.

[161] *See, e.g.*, PCR Counsel's Supp. Resp. at 5-6 (recounting that Trial Counsel had hired an investigator to attempt to locate some of the same witnesses Mr. Thomas believes should have been presented; those efforts just weren't successful). *See also* Trial Counsel's First Aff.; Trial Counsel's Supp. Aff.

From her opening statement through closing, Trial Counsel argued that Keevan Hale died as a result of a drive-by shooting and that Mr. Thomas was not his killer.[162] And to try to sow reasonable doubt and suggest that someone other than Mr. Thomas fired the fatal shots, she presented evidence that: (a) two vehicles were present in surveillance video driving up East 23rd Street about the time of the shooting and a 911 caller said that heard a car at time of the shots;[163] (b) Ms. Ellison's ShotSpotter analysis reported that the initial shots came from the street;[164] (c) there was no eyewitness who either saw the actual shooting or Mr. Thomas with a gun;[165] (d) that no murder weapon was located; (e) Mr. Hale told the police that he did not know what the shooter looked like or what the shooter was wearing;[166] (f) the victim's family's attempts to hide his weapon after the shooting;[167] (g) the discrepancy in the number of projectiles or shells found and reported shots fired;[168] (h) the Hale family's and Mr. Baird's use of the plural to describe who shot Mr. Hale.[169] Trial Counsel also cross-examined the State's

---

[162] A-434-437; A-955-A-960 (Mid-trial motion for judgment of acquittal arguing insufficient evidence of identity); A-1005-1013.

[163] A-744-746; A-754; A-798; A-937-938; A-908, Def.'s Tr. Ex. 1 (Recording of 911 call).

[164] *See* A-227-237; A-658-659.

[165] A-455; A-459-461; A-742; A-778; A-817-818; A-943-944.

[166] A-478.

[167] A-468-469; A-479; A-498; A-580-585; A-775-778.

[168] *E.g.*, A-576; A-585.

[169] A-469-470; A-778; A-778; A-815-818.

witnesses regarding the dubiousness of the gunshot residue evidence, the DNA, and ballistics evidence to cast doubt on Mr. Thomas's guilt.[170] And Trial Counsel reports that, even in hindsight, she's unaware of any other physical evidence that might have been available or introduced on his behalf.[171]

Mr. Thomas's conclusory and speculative second-guessing of trial strategy are insufficient to shoulder his *Strickland* burden.[172] "Determining whether trial counsel was wise to or misguided in selecting this strategy is not the Court's role. *Strickland* doesn't deem trial counsel ineffective for not pursuing the best or most successful strategy; instead, it requires trial counsels be informed by a thorough investigation of law and facts."[173] Here Trial Counsel's acts and strategy were.

---

[170] *See, e.g.*, A-808-811; A-867-868; A-939.

[171] Trial Counsel's First Aff. at 1.

[172] *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Moore v. Deputy Commissioner(s) of SCI-Huntington*, 946 F.2d 236, 246-47 (3d Cir. 1991) ("The most we can say is that from our post-trial position, deprived of course of the feel of the trial courtroom, we think we *might* have recommended something else at the trial if we had been there. Under *Strickland* that is not a sufficient basis to find the counsel to have been ineffective. We can find a Sixth Amendment violation only if we give mere lip service to *Strickland*.") (emphasis in original).

[173] *Peters*, 283 A.3d at 687.

-39-

**2. Trial Counsel didn't need to call a defense gunshot residue or "shot/trauma" expert.**[174]

Mr. Thomas contends that Trial Counsel should have retained a gunshot residue ("GSR") expert to "explain away the State's case" and an "expert on shot/trauma to explain to the jurors that the victim could not have fired off those shots if he was immediately struck by the first gunshot in his heart and lung."[175]

The State called a GSR expert, Joseph Coiro, who explained that the swabs taken from Mr. Thomas's and the victim's hands revealed sufficient GSR particles to conclude that each had either discharged a firearm, been in close proximity to a firearm discharge, or picked up GSR particles through transfer.[176] Mr. Coiro couldn't "say which one is more likely to happen, only that one of those three scenarios is possible."[177] He told the jury that it's possible for one who was shot to have GSR on his person, even if he didn't discharge a firearm himself:

> So, if someone has been shot, it's kind of tricky. There could potentially be gunshot residue particles on that person just because they were shot. So, that person may have been in the vicinity of somebody that discharged the firearm. So, they were in the vicinity of the subject that shot them, or the particles were maintained on that bullet when it was discharged from the firearm and they then transferred to that person via that bullet.

---

[174] Def.'s Rule 61 Mot. at 3-4.

[175] *Id.*

[176] A-799, A-806-807.

[177] A-806.

> So, there's kind of a few scenarios in which it's possible for a victim to have gunshot residue on them.[178]

Mr. Coiro testified that there were also GSR particles on the right cuff of Mr. Thomas's jacket, and a small population of particles in the jacket pocket.[179]

During Trial Counsel's cross-examination, Mr. Coiro acknowledged that GSR can be transferred from object to object inadvertently.[180] He conceded that it was possible for the GSR found to have been transferred to Mr. Thomas's jacket if he had been shot and that the GSR in the jacket's pocket could have been transferred from elsewhere on the jacket.[181] And Mr. Coiro admitted that only the right cuff and right pocket of Mr. Thomas's jacket were tested for GSR because those were the only areas that police investigators asked him to check.[182] And again, as to his conclusion concerning the GSR residue on Mr. Thomas's hands, Mr. Coiro testified he could only say that one of the three scenarios that he testified about earlier—*i.e.*, the person being a shooter, a victim, or just in the vicinity—is possible.[183] So, Trial Counsel used the State's own expert's testimony to demonstrate less-than-

---

[178] A-807.

[179] A-806-807, 810.

[180] A-809.

[181] A-809-810.

[182] A-810.

[183] A-811.

-41-

inculpatory reasons that GSR was found on Mr. Thomas's hands and jacket.[184]

Given all this, Mr. Thomas hasn't demonstrated that Trial Counsel was ineffective by not retaining a defense GSR expert. He simply fails to articulate what more favorable testimony a defense GSR expert could have provided. And as to any purported "shot/trauma" expert, Mr. Thomas merely surmises what such a witness might offer.

In short, these conclusory claims that other experts might have been helpful to his case are insufficient to satisfy Mr. Thomas's *Strickland* burden of substantiating specific allegations of actual prejudice.[185]

### 3. Trial Counsel properly dealt with Mr. Hale's dying declarations.[186]

Mr. Thomas now believes that Trial Counsel should and could have had Mr. Hale's words to the police as he lay near death on his living room excluded from his trial. The State had filed a pretrial motion to admit them.[187] And Trial Counsel initially opposed that application.[188] But after further review Trial Counsel elected not to oppose it.[189]

---

[184] *See* A-1011 (argument by Trial Counsel in closing that the GSR found on Mr. Thomas meant nothing because he was shot).

[185] *Andrus v. State,* 2004 WL 691922, at *3 (Del. Mar. 12, 2004).

[186] Def.'s Supp. to Am. Rule 61 Mot. at 22-25.

[187] A-187-188.

[188] A-200.

[189] A-212.

So, the record reflects that Trial Counsel evaluated the issue, weighed its merits, and decided as a matter of strategy—against opposing the motion. In cross-examination, Trial Counsel used the dying declarations and body-camera evidence of that exchange to bolster the misidentification defense.[190] Given controlling law on this evidentiary and her reasonable strategy, the Court can't find Trial Counsel's decision lacking.[191]

### 4. Trial Counsel didn't prohibit Mr. Thomas from testifying.[192]

Mr. Thomas complains that Trial Counsel prevented him from testifying. The trial record demonstrates that didn't happen.[193]

Before the defense rested its case, the Court conducted a thorough colloquy to confirm that Mr. Thomas fully understood his right to testify or not.[194] Mr. Thomas unequivocally acknowledged that he understood the decision to testify or not to testify was his alone and that he could accept or

---

[190] A-478.

[191] *Drummond*, 2002 WL 524283, at *1 ("It is not this Court's function to second-guess reasonable tactics."). *See Shelton v. State*, 744 A.2d 465, 503 n.183 (Del. 2000) ("[T]he Sixth Amendment does not require counsel to pursue meritless arguments before a court."); *Peters*, 283 A.3d at 680 ("Further, counsel cannot be ineffective for failing to make futile arguments.") (internal quotes omitted).

[192] Def.'s Resp. to 61(e)(7) Mot. at 2.

[193] Though it was Trial Counsel's "professional advice to [Mr. Thomas] was that he should not testify." Trial Counsel's First Aff. at 1.

[194] A-948-951.

reject whatever Trial Counsel might advise on that.[195] He clearly understood the decision he was making. And the Court concluded then that Mr. Thomas's "choice whether or not to testify [was] made knowingly, intelligently and voluntarily after having consulted with counsel."[196]

As this Court has previously held, "[i]f the defendant makes the decision to waive his right to testify and the Court engages in a colloquy with the defendant to determine whether the waiver is knowing and voluntary, then the defendant cannot show cause or demonstrate prejudice suffered as a result of his decision."[197]

## C. **PCR CLAIM NO. THREE** – IAC APPELLATE COUNSEL (MISCELLANEOUS)

Mr. Thomas brings more claims regarding Appellate Counsel's performance on direct appeal. All are meritless.

### 1. Appellate Counsel couldn't have argued IAC of Trial Counsel on direct appeal.[198]

According to Mr. Thomas his Appellate Counsel should have raised an ineffective assistance of trial counsel claim on direct appeal. He's mistaken. Appellate counsel couldn't be ineffective for forgoing such a claim because the Delaware Supreme Court has repeatedly held that claims of ineffective assistance of

---

[195] A-949-950.

[196] A-951.

[197] *State v. Taye*, 2014 WL 785033, at *5 (Del. Super. Ct. Feb. 26, 2014) (citing *Erskine v. State*, 2013 WL 1919121, at *2 (Del. May 7, 2013)).

[198] Def.'s Rule 61 Mot. at 3.

trial counsel cannot be considered for the first time on direct appeal.[199]

## 2. Appellate Counsel made no improper concession at oral argument.[200]

Mr. Thomas takes issue with Appellate Counsel's statement at oral argument that the fact that he was wearing a ski mask on the warm night of the shooting could certainly be some evidence of "a consciousness of guilt of something."[201] As Appellate Counsel rightly observed, "Since case law supports the conclusion that hiding one's identity reveals a consciousness of guilt, [ ] counsel would have done damage to the argument had she not conceded that point."[202]

There was no deficient performance here. Nor has Mr. Thomas demonstrated that had this single statement at oral argument not occurred then there was a meaningful chance that his conviction would have been reversed.[203]

## 3. Appellate Counsel should have argued more than insufficient evidence.[204]

Mr. Thomas also criticizes Appellate Counsel for her informed and measured

---

[199] *Johnson v. State*, 962 A.2d 233, 234 (Del. 2008) ("This Court has consistently held that it will not consider a claim of ineffective assistance of counsel on direct appeal if that issue has not been decided on the merits in the trial court." (citing cases)).

[200] Def.'s Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 50.

[201] A-951.

[202] App. Counsel's Supp. Aff. at 5.

[203] *Baynum*, 211 A.3d at 1084 (stating that there can only be a finding of the required prejudice "when there is a substantial likelihood—*i.e.*, a meaningful chance—that a different outcome would have occurred but for counsel's deficient performance").

[204] Def.'s Rule 61 Mot. at 3; Def.'s Mem. on Am. Rule 61 Mot. at 50-52.

decision to argued only insufficiency of evidence when seeking reversal of his conviction. No doubt, Appellate Counsel made this tactical call after a thorough review of the applicable law and facts.[205]

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."[206] Indeed, thoughtfully engaging that winnowing process to focus "on those more likely to prevail, far from being evidence of incompetency, is the hallmark of effective appellate advocacy."[207]

## D. PCR CLAIM NO. FOUR – PROSECUTORIAL MISCONDUCT/ CLOSING ARGUMENT

Mr. Thomas says that his "conviction was obtained in violation of due process, 14th U.S. Const. Amend.," because "in [his] closing argument . . . the prosecutor made a highly prejudicial statement to the jurors."[208] Mr. Thomas says without this statement "the jurors would not have found [him] guilty of murder in the first degree."[209] That statement is: "Defendant's intent and purpose was to kill Keevan Hale by gunfire and he succeeded. The evidence shows beyond a reasonable doubt

---

[205] *See generally* App. Counsel's First Aff.; App. Counsel's Supp. Aff.

[206] *Barnes*, 463 U.S. at 751-52.

[207] *Murray*, 477 U.S. at 536 (cleaned up).

[208] Def.'s Rule 61 Mot. at 3.

[209] *Id.* at 4.

that Kashiem Thomas intentionally caused the death of Keeven Hale by shooting him with a firearm, and we ask that you find him guilty as charged."[210]

Because the specific wording of the prosecutor's statement—in the specific context made and the entirety of the remainder of the State's argument—wasn't improper, Mr. Thomas is due no relief on this claim of trial error.[211]

The State was required to prove that he intentionally killed Mr. Hale. Intent is often inferred from a perpetrator's actions.[212] And, "[t]he intent necessary for First Degree Murder may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the death."[213] And it was only after addressing the evidence of all of these attendant circumstances, that the prosecutor made the statement Mr. Thomas complains of. This was not prosecutorial misconduct.[214]

---

[210] A-1004.

[211] Resultingly, the Court need not even consider his charge that Trial and Appellate Counsel were each ineffective for failing to challenge the prosecutor's now-complained-of utterance. *See* Def.'s Rule 61 Mot. at 3-4. *See Shelton*, 744 A.2d at 503 n.183 ("[T]he Sixth Amendment does not require counsel to pursue meritless arguments before a court."); *Peters*, 283 A.3d at 680 ("Further, counsel cannot be ineffective for failing to make futile arguments.") (internal quotes omitted).

[212] *Brown v. State*, 233 A.2d 445, 447 (Del. 1967).

[213] *Benson v. State*, 105 A.3d 979, 983-84 (Del. 2014).

[214] *See Burns*, 76 A.3d at 789 (reasoning that a prosecutor is "allowed to argue all legitimate inferences of the defendant's guilt that follow from the evidence"). *See also Hooks v. State*, 416 A.2d 189, 204 (Del. 1980) (stating in her final summation that a prosecutor "should not be confined to a repetition of the evidence presented at trial"); *see also Spence v. State*, 129

### E.  PCR CLAIM NO. FIVE – "NEWLY DISCOVERED EVIDENCE"[215]

Mr. Thomas and Trial Counsel both suggest that the Court should grant a new trial because of "newly discovered evidence."[216]  The allegedly newly discovered evidence is an online "Motherboard" article titled *Police Are Telling ShotSpotter to Alter Evidence from Gunshot-Detecting AI* published in July 2021 by VICE Media, LLC ("VICE Media") and is highly critical of ShotSpotter.[217]

While an inmate may invoke Rule 61 to seek a new trial if such a motion would be time-barred under this Court's Criminal Rule 33, when he does so his claims are subject to Rule 61's procedural bars.[218]

Alluded to by Mr. Thomas here, subsection (d)(2)(i) requires a movant to plead with particularity that "new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted."[219]  Under Rule 61(d)(2)(i), Mr. Thomas shoulders a heavy burden

---

A.3d 212, 228-29 (Del. 2015) (observing that when prosecutors make such statements, they should include a qualifier "such as, for example, 'the evidence demonstrates.'").

[215]  Def.'s Am. Rule 61 Mot. at 4; Def.'s Mem. on Am. Rule 61 Mot. at 52-62.

[216]  *Id.*; Trial Counsel's Supp. Aff. at 1-2; D.I. 149 (Exhibits to Trial Counsel's Supp. Aff.); D.I. 122 (Unsolicited e-mail from Trial Counsel to Court during postconviction proceedings providing link to online article).

[217]  Todd Feathers, *Police Are Telling ShotSpotter to Alter Evidence From Gunshot-Detecting AI*, MOTHERBOARD TECH BY VICE (July 26, 2021), https://www.vice.com/en/article/qj8xbq/police-are-telling-shotspotter-to-alter-evidence-from-gunshot-detecting-ai (last accessed December 13, 2024).

[218]  *Downes v. State,* 771 A.2d 289, 292 (Del. 2001).

[219]  Super. Ct. Crim. R. 61(d)(2).

in establishing that the existence of "new evidence" creates a strong inference of his actual innocence.[220] Of import here, a movant can't successfully navigate the "actual innocence" standard with evidence that is "merely cumulative or impeaching."[221] Thus, any new evidence "that goes *only* to the weight or credibility of that which was presented to the jury is almost never adequate to meet the demanding bar for being granted a new trial."[222] Yet, characterizing it in a most generous way that is precisely what the "Motherboard" article is. As such, Mr. Thomas did not carry his heavy burden[223] under Rule 61(d)(2)(i) or (i)(5).[224]

## F. PCR CLAIM NO. SIX – CUMULATIVE ERROR[225]

Lastly, Mr. Thomas says his due process right to a fair trial was denied because of the cumulative effect of all the purported errors discussed above.[226] Not so. Because Mr. Thomas has failed on each count to prove that his trial counsel

---

[220] *Purnell v. State*, 254 A.3d 1053, 1100 (Del. 2021) ("Satisfying the actual innocence test is, by design, a heavy burden, and such meritorious claims are exceedingly rare.").

[221] *Id.* at 1098-99.

[222] *Id.* at 1098.

[223] *Bass v. State*, 299 A.3d 336, 359 (Del. June 20, 2023) ("Satisfying the actual innocence test is, by design, a heavy burden, and such meritorious claims are exceedingly rare.") (alteration omitted) (quoting *Purnell*, 254 A.3d at 1100).

[224] *See Madison*, 2022 WL 3011377, at *7; *see also Mason v. State*, 2020 WL 7392348, at *1 n.2 (Del. Dec. 16, 2020) ("New evidence that is merely cumulative or impeaching will not satisfy the actual innocence standard.") (cleaned up).

[225] Def.'s Mem. on Am. Rule 61 Mot. at 70-72.

[226] *Id.*

was *Strickland*-level deficient and that, but for trial counsel's performance, the outcome of his trial would have been different, he fails in the aggregate.[227] "[A] claim of cumulative error, in order to succeed, must involve matters determined to be in error; not the cumulative effect of non-errors."[228]

## G. Mr. Thomas's Complaints About Postconviction Counsel's Efforts

As mentioned at the opening of this opinion, Mr. Thomas has expressed great dissatisfaction with his Postconviction Counsel.[229]

No doubt, "in a jurisdiction like Delaware, where ineffective assistance of trial counsel may not be raised on direct appeal, the first postconviction 'proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim.'"[230] But just as with his prior proceedings, "[w]hen a defendant is represented by counsel, the authority to manage the day-to-day conduct of the defense rests with the attorney."[231] The professional standards for defense counsel are well-understood. And the Court expects no less of postconviction counsel when

---

[227] *See State v. Calhoun*, 2024 WL 261329, at *11 (Del. Super. Ct. Jan. 23, 2024), *aff'd*, 2024 WL 4821679 (Nov. 19, 2024).

[228] *State v. Sykes*, 2014 WL 619503, at *38 (Del. Super. Ct. Jan. 21, 2014), *aff'd*, 147 A.3d 201 (Del. 2015).

[229] *E.g.* Def.'s Resp. to 61(e)(7) Mot.; Def.'s Mot. to Stay; D.I. 160; D.I. 163; D.I. 165; D.I. 169.

[230] *Guy*, 82 A.3d at 715 (quoting *Martinez v. Ryan*, 566 U.S. 1, 12 (2012)).

[231] *Cooke*, 977 A.2d at 840-41 (stating that the defense attorney has the "immediate and ultimate responsibility" of deciding what defenses to develop and claims to press).

he or she investigates a matter to determine if a Rule 61 movant's potential claims have sufficient merit for counsel to ethically advance them or when discerning whether any other substantial ground for relief might be available.[232]

That said, just as at any other stage of the criminal proceeding, "the duty to investigate does not force [postconviction] defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."[233] Indeed, "he or she need not travel blind alleys in hope they might lead to something helpful to his or her client's case."[234]

On a Rule 61(e)(7) motion, the immediate backstop is the movant's ability to respond directly and suggest possible claims,[235] as well as, the Court's own review of the record to determine whether his Rule 61 motion is devoid of any, at least, arguable postconviction claims.[236] And just as with counsel at the earlier phases of this case, a postconviction attorney's strategic or tactical choices made after

---

[232] Super. Ct. Crim. R. 61(e)(7).

[233] *Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *Haight v. Jordan*, 59 F.4th 817, 835 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 578 (2024) ("[C]ounsel is required only to conduct a reasonable investigation.") (citing *Mahaffey v. Page*, 151 F.3d 671 (7th Cir. 1998), *vacated on other grounds*, 162 F.3d 481 (7th Cir. 1998)).

[234] *State v. Harrell*, 2017 WL 2418278, at *2 (Del. Super. Ct. June 5, 2017) (cleaned up).

[235] Super. Ct. Crim. R. 61(e)(7) (stating that PCR counsel's "motion shall explain the factual and legal basis for counsel's opinion and shall give notice that the movant may file a response to the motion within 30 days of service of the motion upon the movant").

[236] *See Lindsey*, 2023 WL 2535895, at *5.

thorough investigation of the relevant law and facts are virtually unchallengeable.[237] Just so here. To be sure, a duo of unshy and well-experienced postconviction attorneys have thoroughly examined Mr. Thomas's case for arguable claims that might now be advocated. There just are none.

## CONCLUSION

Having reviewed the record carefully, the Court has concluded that Mr. Thomas's claims are without merit, and no other substantial grounds for relief exist. Accordingly, Mr. Thomas's Motion for Postconviction Relief is **DENIED** and Postconviction Counsels' Motion to Withdraw is **GRANTED**.

**SO ORDERED,**

/s/ *Paul R. Wallace*

Paul R. Wallace, Judge

Original to Prothonotary

---

[237] *Green*, 238 A.3d at 174.